**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ALMA CANTU and DARLENE REED, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| VS. | § | CIVIL ACTION NO. H-09-0576 |
| | § | |
| VITOL, INC., | § | |
| | § | |
| Defendant | § | |

**MEMORANDUM AND ORDER**

This is a lawsuit under the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.* The plaintiffs, Alma Cantu and Darlene Reed, worked as contract administrators at the Houston office of Vitol, Inc., an energy trading company. Contract administrators assist Vitol's energy traders in completing contracts to buy and sell oil and natural gas products. The contract administrators were paid a salary and not paid overtime. Reed and Cantu sued Vitol on February 25, 2009 and faxed a copy of the suit to Vitol's Houston office late on February 26. On February 27, Cantu was fired and on March 8, Reed was fired. Both allege that they were fired in retaliation for protected activity. Vitol seeks partial summary judgment, limited to the retaliation claims. (Docket Entry No. 43). In its motion, Vitol argues that it is entitled to judgment as a matter of law because the evidence shows that the plaintiffs' supervisor had decided to fire them because of poor performance well before they filed this lawsuit. Vitol argues that it had delayed the actual firing until it could had arrange for a replacement and an orderly transition. The plaintiffs responded to the partial summary judgment

motion, (Docket Entry No. 47); Vitol replied, (Docket Entry No. 50); and the plaintiffs surreplied, (Docket Entry No. 55).[1]

Based on the motion, response, and replies; the parties' submissions; the summary judgment evidence; and the applicable law, this court grants Vitol's motion for partial summary judgment in part and denies it in part. Specifically, this court grants the motion as to Reed's retaliation claim, finding that the undisputed evidence in the summary judgment record shows that the decision to fire Reed was made well before any protected activity and for reasons unrelated to such activity. The motion is denied as to Cantu's retaliation claim because the record is insufficient to find that, as a matter of law, the decision to fire her was made before she engaged in protected activity. The detailed reasons are explained below.

## I.    Background

Vitol is an energy trading company with an office in Houston, Texas. (Docket Entry No. 10, First Amended Complaint, ¶ 23). Energy traders in Vitol's Houston office buy and sell oil and natural gas products. The contract administrators support the traders and complete the contracts memorializing the trades. (Docket Entry No. 43-6, Ex. 1, Colona Aff., ¶¶ 3–8). Traders are responsible for negotiating the purchases and sales with a "counter-party." Some of the transactions are facilitated with third-party brokers while others are completed directly with the counter-party. When a contract is negotiated, the trader creates an internal "deal sheet," which specifies the trade terms. (*Id.*, ¶¶ 3–10). The trader then forwards the deal sheet to the Contract Administration

---

[1]  In their surreply, the plaintiffs attached two depositions from Vitol traders. The depositions were not attached to the initial response, although they were available then. Vitol objected to the attachments and also moved to supplement the record by attaching additional excerpts from these depositions. (Docket Entry No. 56). Vitol's objection is overruled; the motion to supplement the record is granted. While Vitol is correct that the plaintiffs should have attached to these depositions to their initial response, there is no prejudice because of the supplementation of the record.

Department.  A contract administrator "is responsible for selecting the proper contract template, creating the contract, and taking the information from the deal sheet and populating it into the contract."  (*Id.*, ¶ 7).  Administrators are also responsible for reviewing other documents provided by a trader, broker, or counter-party to identify any discrepancies between a term in the deal sheet and the other documents.  Only traders are authorized to change a contract's terms from those in the deal sheet.  If a term is disputed before the contract is signed, the administrator must go to the trader to resolve it.  Administrators are required to save all communications related to a transaction and save them to Vitol's document-management system, "DIVA."  (*Id.*, ¶¶ 3–10).

The transactions during the period in question were voluminous.  Because changes in market prices, the transactions are often time-sensitive.  Vitol asked its administrators to "complete each contract within twenty-four hours of receiving the deal sheet."  (*Id.*, ¶ 9).  Vitol also required its administrators to follow formal contract "Confirming and Writing Procedures."  The procedures were designed to avoid errors by the administrators, which Vitol asserts "can result in losses of hundreds of thousands of dollars."  (*Id.*, ¶ 6).

Darlene Reed worked at Vitol from July 2008 to March 2009; Alma Cantu from September 2008 to February 2009.  (Docket Entries No. 47-5, Ex. D, Cantu Aff., ¶ 2; 47-6, Ex. E, Darlene Reed Aff., ¶ 2).  Their immediate supervisor was Dedreah Hicks-Edwards, Vitol's contract administration manager.  (Docket Entry No. 43-3, Hicks Depo. at 16).  Brian Colona was Vitol's operations manager and "had the sole authority to terminate and hire [a]dministrators."  (Docket Entry No. 43-2, Colona Depo. at 48, 51).

In May 2008, Reed submitted a resume to Vitol indicating that she had three years experience as an administrator at a sophisticated trading operation, Trafigura AG.  (Docket Entry

No. 43-6, Ex. 4, Darlene Reed Resume).  Vitol hired Reed as a full-time administrator in July 2008,

after an interview in which she assured Vitol she could perform the administrator's job but admitted

that she did not have experience with international contracts.  (Docket Entry No. 43-5, Reed Depo.

at 32–33).  Cantu submitted her resume in August 2008.  Her resume stated that she had over seven

years of experience working with energy contracts.  (Docket Entry No. 43-6, Ex. 5, Alma Cantu

Resume).  During her interview, she highlighted her previous experience at Shell Trading Company

and stated her belief that those experiences qualified her to be a contract administrator at Vitol,

although she admitted that she had primarily worked with crude oil contracts.  (Docket Entry No.

43-4, Cantu Depo. at 33–34).  Vitol initially offered Cantu a part-time trial position, which lasted

from September 8, 2008 until November 30, 2008.  Vitol hired her full-time beginning on December

1, 2008.  (*Id.* at 51, 61).  The job duties were the same in both.  (*Id.* at 62–64).

     Vitol alleges that Reed began to have performance problems in October 2008.  Hicks, Reed's

immediate supervisor, testified that several traders who worked on South American transactions met

with her to express concerns about Reed's work on their contracts and accompanying

documentation.  Hicks sent an email to Reed on October 17 that explained new procedures "to make

sure we are not missing anything" and met with her to discuss them.  (Docket Entry No. 43-3, Hicks

Depo. at 75–76; Docket Entry No. 43-6, Ex. 6, Oct. 17, 2008 email chain).  On October 23, Hicks

again met with Reed to discuss issues Hicks and the traders were having with Reed.  In an email sent

to Colona, Hicks stated that Reed wanted "to go tit for tat with [Meredith Mandel, a trader] on

EVERYTHING and no one has time for that."  (Docket Entry No. 43-6, Ex.7[2]

---

[2]  Cantu and Reed moved to strike certain summary judgment evidence, including this email.  The objection
is that it contains inadmissible hearsay.  Cantu and Reed also object to any emails offered "to establish the
occurrence of certain conversations that Mrs. Reed had with traders, Mrs. Hicks, and the particular actions
Mrs. Reed took on specific transactions."  (Docket Entry No. 48, at 2).  These emails, however, are not

Reed sent an email to herself on November 7, stating that Mandel had come "over to her desk and [yelled] at me about the contents of a contract for the 2nd time in as many months."  (*Id.*, Ex. 8, November 7, 2008 email chain).  Because of the apparent conflict between Reed and Mandel,

---

offered either for the truth of their contents.  Instead, they are offered to show the supervisors' state of mind. *See King v. Tecumseh Pub. Sch.*, 229 F.3d 1152 (Table), 2000 WL 1256899, at *5 (6th Cir. July 13, 2000) (admitting supervisors' testimony about letters regarding the plaintiff's job performance because they are relevant to the supervisors' state of mind and are not hearsay); *Wallace v. Tex. Tech. Univ.*, 80 F.3d 1042, 1048 n.4 (5th Cir. 1996) (admitting testimony of employer containing specific instances in which employee did not follow instructions and questioning employer's decisions over hearsay objection even though the employer had no personal knowledge of the incidents because they were not offered for the "truth of the events, but rather, he offers his belief that these incidents occurred as proof of his motive for failing to renew [the plaintiff's] contract."); *Crouch v. England*, Civ. A. No. C-05-391, 2006 WL 1663760 (S.D. Tex. June 14, 2006) ("[I]n the context of an employment discrimination lawsuit where the employer is offering reasons for terminating an employee, such statements are not considered hearsay because they are not offered for the truth of the matter asserted.  Rather, they are offered to show the supervisor's state of mind when making the decision to terminate the plaintiff."); *Culwell v. City of Ft. Worth, Tex.*, 503 F. Supp. 2d 813, 816 n.3 (N.D. Tex. 2007) (admitting portions of supervisor's affidavit relating events involving the plaintiffs of which the supervisor had no personal knowledge because those portions were relevant to show the supervisor's belief that the events occurred and to his decision to terminate the plaintiffs).

Cantu and Reed also object to all emails submitted by Vitol on the basis that they were improperly authenticated as business records.  Cantu and Reed assert that Scott Adams's declaration does not lay a proper foundation for the business records exception to the hearsay rule.  Because this court finds that these emails are admitted for a purpose that takes them out of the hearsay rule, there is no need for a business records predicate.  "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EV. 901(a).  "The standard for authenticating evidence is low and may be satisfied 'by evidence sufficient to support a finding that the matter in question is what its proponent claims.'" *United States v. Carroll*, No. Crim. A. 99-88, 2000 WL 45870, at *3 (E.D. La. Jan. 20, 2000) (quoting *United States v. Arce*, 997 F.2d 1123, 1128 (5th Cir. 1993)); *see also United States v. Jackson*, 625 F.3d 875, 881 (5th Cir. 2010) ("[The Fifth Circuit does not require conclusive proof of authenticity before allowing the admission of disputed evidence. . . . [Rule 901] merely requires some evidence which is sufficient to support a finding that the evidence in question is what its proponent claims it to be.").  Courts have found that emails are properly authenticated by testimony as to their authenticity and distinctive characteristics of emails. *See United States v. Siddiqui*, 235 F.3d 1318, 1322–23 (11th Cir. 2000) (upholding authentication of emails based on email addresses and consistency of contents with knowledge of author); *Gary v. Combined Grp. Ins. Servs., Inc.*, Civ. A. No. 3:08-CV-228-L, 2009 WL 2868485, at *6 (N.D. Tex. Sept. 4, 2009) ("Because [the exhibits] have distinctive e-mail characteristics and because Plaintiff has stated in her affidavit that she wrote and sent these emails, the Court finds that they meet the threshold for authentication for summary judgment purposes.").  The emails have the distinctive characteristics of emails. Scott Adams, Vitol's human resources director,  testified in a sworn affidavit that he collected the emails from Vitol's email system.  (Docket Entry No. 43-6, Ex. 2, Adams Aff.).  They are properly authenticated.

Finally, Cantu and Reed object to Exhibit 13, notes that Hicks kept from a meeting with Reed.  Hicks testified about these notes.  The motion to strike, (Docket Entry No. 48), is denied as to these exhibits.

5

Hicks instructed Reed to send all communications for Mandel to Hicks first so that she could review them and comment.  (*Id.*).

Vitol alleges that the relationship between Hicks and Reed continued to deteriorate.  On November 12, 2008, Hicks sent Reed an email discussing markups she had made on several contracts Reed had worked on and Hicks had reviewed.  Hicks copied Brian Colona.  From the context of Hicks's email, it appears that Reed had expressed dissatisfaction with Hicks's markups. Hicks wrote,

> Darlene, for the YPF contract response below, I suggest in the future you keep the cute and/or smart comments out. . . .
>
> I do not run these reports every other day and question activity missing without a specific purpose in mind; covering you and the traders and Vitol's position as my sole purpose and goal and I expect full cooperation from you both in responses and in getting the job done minus any attitude.
>
> Further, when I mark up your contracts, just like I do everyone else's in the department, this should not be taken as a personal attack as I feel you are taking/making it, this is all business, when I make corrections to your or any one else's contracts/amendments/comments before it goes to the trader for review . . . it just speeds up the process of getting the contracts out of the door accurately and wastes less time on the trader's part which is critical.
>
> My purpose in overseeing this group is two-fold — most importantly 100% accuracy of the contracts, however continued growth, knowledge and experience of the contract administrators is very important to me and I spend a lot of time and advice meant to benefit you will only work if you willing to put your arms around it.
>
> If you would like to sit down and further discuss any of these points that I am specifically requesting improvements on, my door is always open.

(*Id.*, Ex. 9, November 10, 2008 email chain).  Hicks forwarded the email to Colona, who stated, "Well done and well said.  Have you located her replacement?  Seems 50/50 that she will make it." (*Id.*).

Reed replied to Hicks's email on November 12.  In the reply, Reed stated that she had not intended her answers to the questions Hicks raised as being "cute and/or smart."  Reed explained that she was "trying not to second guess" what Hicks expected and instead only to "give answers to your specific questions."  (*Id.*, Ex. 10, November 12, 2008 email chain).   In response to taking the mark-up of her contracts as a "personal attack," Reed stated that she did feel that the mark up "seems to have grown since last week."  She asked Hicks to have another talk at her earliest convenience.  (*Id.*).  In reply, Hicks stated that she wanted to wait until the following week when Brian Colona would be back in the office and could join them, to "have another set of ears and eyes on the issues and so there will be no confusion going forward."  In response to Reed's question about why Hicks had sent the email, Hicks explained that Reed's position was not entry-level and Hicks did not expect to have to ask specific detailed questions and receive obvious answers.  In response to Reed's concern about the increase of mark ups on her contracts, Hicks explained that this is "due to the traders advising me of their concerns."  (*Id.*).

Hicks sent another email to Colona about Reed on November 20.  In that email, she detailed concerns she had with Reed's "abilities and judgment."  The specific concerns arose from Reed's work on a particular contract.  After explaining the issue, Hicks stated, "[m]y concern here is does she really not get this or does she really not care?  I am at a loss with her at this stage and having to nit-pick through everything she does occupies way too much of my time."  (*Id.*, Ex. 11, November 20, 2008 email).  Hicks continued to explain that Reed was "continuing to hold a grudge and

maintain an attitude . . . the only person she will talk to is Jennifer. . . .  I really need to sit and talk about this, I want to show the documents, some the emails I have sent her and the lack of quality of work (not all the time — sometimes she is 100% on track) she is doing so you better understand my frustrations and also help me understand what it is I need to do get her out of this funk and on with her work.  I like Darlene and think she is a good person and I want to see her do well at Vitol, on the other hand I'm not willing to dedicate hours and hours every day sifting through her work because I have no faith in her abilities or loyalties to Vitol."  (*Id.*).

Hicks testified that shortly after these emails, Reed requested a contract amendment without consulting the trader.  The request "undid" much of the trader's work.  (Docket Entry No. 43-3, Hicks Depo. at 75–76; Docket Entry No. 43-6, Ex. 12, November 25, 2008 email chain).

On November 26, 2008, Reed met with Colona.  In an email to Hicks, Colona stated that he told Reed "that her attitude needed to change toward the traders and particularly toward you," and that she needed to avoid "getting defensive or hurt about the constructive criticism."  (Docket Entry No. 43-6, Ex. 14, November 26, 2008 email chain).  Colona also advised Hicks that she should find a way to be more "gentle and patient."  (*Id.*).

On January 5, 2009, Hicks sent Colona an email exchange she had with Reed and the South American traders.  In the email, Hicks explained a problem she had with a clause in a contract Reed prepared.  To Colona, Hicks explained that she remained concerned that Reed was not listening to suggestions and explanations.  Colona responded, "[t]hink we skip the warning letter and let her go. But we need a plan for a new person."  (*Id.*, Ex. 15, January 5, 2009 email chain).  Hicks sent Colona an email on January 14, 2009, stating that Reed had "just got up and walked out."  Colona and Hicks exchanged emails in which Colona again stated that a replacement for Reed should be found and she

should be fired with no probationary period.  (*Id.*, Ex. 16, January 15, 2009 email chain).  On

January 21, less than a week later, Hicks sent Colona an email stating that Reed was "2+ weeks of

work behind" and that Hicks had spent the last two days cleaning up that mess."  Hicks stated that

Reed took too many long lunches and spent too much time on personal phone calls and was simply

not doing her job."  Hicks stated that she intended to have a "serious talk" with Reed if she returned

to work the following day.  Colona responded:

> I think it's worth having that discussion with her just to see how she
> responds (and to have another documented discussion with her about
> her performance) but the real goal here is to find a replacement for
> her so we can move on.  She's fired as far as I'm concerned, it's only
> a question of the effective date of that firing.

(*Id.*, Ex. 17, January 21, 2009 email chain).

Reed sent herself an email dated January 22, 2009, after she met with Colona.  Reed wrote:

> Brian and I had a meeting today and I feel it was quite futile.  I began
> by telling him how I feel I'm working in a hostile environment and
> it was extremely stressful and not good . . . .  I told him that I felt
> there is nothing I can do that is right, I am criticized about everything
> I do and it is hard to work when all you have on your mind is "what
> is [Hicks] telling [Colona] now," "What is she going to find now";
> "am I going to be fired today".  It is not a healthy environment.

(*Id.*, Ex. 18, January 22, 2009 email).  Reed stated in the email that Colona reminded her that others

did not have a problem with Hicks; Reed responded that "perhaps the other people were afraid to

speak up and that I am the product of being honest and speaking up."  (*Id.*).  When Reed persisted

in arguing that others were lying about Hicks to try to save their jobs, Colona "became angry and

said he was through with this stuff."  Reed concluded, "[w]e'll see what happens."  (*Id.*).

Vitol has produced evidence that it began looking for new administrators in late January or

early February of 2009.  Colona testified that Vitol began searching for replacements in January

2009.  (Docket Entry No. 43-2,  Colona Depo., 70).  On February 6, 2009, Hicks received an email

from a personnel consultant describing three job candidates.  (Docket Entry No. 43-6, Ex. 19, MK

Personnel email).  Hicks also testified that she and Scott Adams, Vitol's human resources director,

began reviewing resumes and conducting preliminary interviews in January 2009.  (Docket Entry

No. 43-3, Hicks Depo., 112–14).  One candidate, John Luke McConn, impressed Hicks and Adams,

who recommended him to Colona.  After interviewing McConn on February 21, Colona extended

him a job offer, which he accepted on February 25, 2009, to begin work on March 2.  (*Id.*, 113–14;

Docket Entry No. 43-2, Brian Colona Depo., 50; Docket Entry No. 43-6, Ex. 21, Feb. 20, 2009

email; Ex. 22, Feb. 25, 2009 email chain).

Reed disputes that her work was below standard and that she was unable to get along with

the traders and her supervisors.  She stated that "[a]t all times during my employment, I followed

Vitol's written procedures for editing and proofreading contracts"; and that "[d]uring my tenure at

Vitol, I was never told that I made significant errors or completed an unacceptable volume of

contracts."  (Docket Entry No. 47-6, Ex. E, Reed Aff., ¶ 5 ).  She stated her belief that she was

"polite and respectful of her supervisors and peers."  (*Id.*, ¶ 11).  Reed also noted that the vessel

contracts on which she worked were larger, and more time-consuming, than contracts handled by

other administrators.  (*Id.*, ¶¶ 8–9).  She also points out that she was never told that she was expected

to complete any specific number of contracts, or that she should complete similar numbers of

contracts as other administrators.  (*Id.*, ¶ 10).

Antonio Maaroui, Vitol's head of trading in Latin America and the Carribean,  testified about

Reed's employment at Vitol.  Maaroui supervised a number of contracts on which Reed worked, but

he was not her ultimate supervisor.  (Docket Entry No. 56-1, Ex. 1, Maaroui Dep., 10, 35).  Maaroui

recalled informing Hicks that he was not happy with Reed.  (*Id.*, 47).  Reed points out that Maaroui could not recall any specific mistakes she had made on her contracts or any contract he had not approved.  (Docket Entry No. 55-1, Ex. J, Maaroui Depo. at 10–11, 54).  Maaroui did, however, testify that Reed "used to ask too many questions and she didn't seem to have experience because . . . when you ask so many questions about trivial things then, you know . . . I've had . . . people that have come to me and . . . they only ask the right question and that's it and they don't ask that many." (*Id.*, 43).  He also testified that on one occasion, Reed had improperly communicated with a client, which could have adversely impacted Vitol's relationship with that client.  (Docket Entry No. 56-1, Ex. 1, Maaroui Depo. at 10, 47).

Reed also disputes the timing of the decision to fire her.  She asserts that there is evidence that Colona did not finalize his decision to terminate her employment until after she filed this suit. Reed points to a memo prepared by Hicks and Colona on February 4, 2009, which lists eight problems with Reed's work and admonishes her that "[f]ailure to comply with these requirements or any further performance/behavior problems may result in additional action, potentially including dismissal."  (Docket Entry No. 47-8, Ex. G, Reed memo.).  The memo concludes, "[a]side from the issues noted above, your knowledge and skill is in general satisfactory.  Vitol sees great value in continuing this relationship and hopes you will take this discussion seriously and make necessary changes so we can move forward in a positive and constructive manner."  (*Id.*).  Reed argues that this memo shows that on February 4, Colona intended to put her on probation rather than fire her. Hicks testified that she drafted the memo and sent it to Colona to have in the file.  Neither Hicks nor Colona sent it to Reed.  (Docket Entry No. 47-9, Hicks Depo., 121).  Instead, according to Vitol, as the emails showed, Hicks and Colona began looking for a replacement for Reed starting on February

11

6, when Hicks received the first resumes to review; and Colona had decided on the replacement on February 25, to begin on March 2.

The record on Cantu is much sparser.  Vitol alleges that at the same time Colona and Hicks began discussing firing Reed and finding a replacement for her, they also considered terminating Cantu's employment.  Hicks testified that in December 2008 and January 2009, she began exchanges with Colona about Cantu.  Hicks testified that some were verbal and others in emails, but Vitol has not produced emails in which Hicks expressed concerns to Colona over Cantu's work.  (Docket Entry No. 43-3, Hicks Depo., 107).

On February 9, 2010, Hicks sent an email to Vitol's administrators modifying the Contract Confirming and Writing Procedures and reassigning work among the administrators.  (Docket Entry No. 43-10, Ex. 23, 2009 Contract Goals Responsibilities and Guidelines).  Cantu received responsibility for pipeline contracts, which she considered an increase in her workload.  The next day, Cantu sent Hicks an email expressing concern about her increased workload and her belief that she could not complete all her contracts within 24 hours "without having to work an enormous amount of overtime."  (*Id.*, Ex. 24, February 10, 2009 email).  Vitol argues that Hicks did not recognize this email as a complaint about not being paid for overtime hours, but rather as a complaint about  workload.  Hicks told Cantu that she would "get the hang of it."  (*Id.*).  On February 13, 2009, Cantu sent another email to Hicks, stating that she was "willing to put in the overtime required to meet the daily deadlines . . . however, please advise what my overtime pay rate will be to accomplish these daily tasks."  (*Id.*, Ex. 25, Cantu email.).  Hicks responded that Cantu was paid on a salary basis and there was no overtime pay.  (*Id.*, Ex. 26, Feb. 10 email).  Hicks testified that she and Colona considered the administrators exempt from FLSA requirements. (Docket Entry No. 43-3, Hicks Depo. at 25–27).

Cantu claims that after she asked about overtime pay, Vitol began to treat her differently. She alleges that she created a spreadsheet-and-mail-merge system which transferred information from deal sheets to contracts, but that Hicks prevented her from using it. (Docket Entry No. 43-4, Cantu Depo., 112–14). Cantu acknowledged that her system was not contained in Vitol's Confirming and Writing Procedures, and that she did not obtain Hick's or Colona's permission to use her system. Cantu testified that Hicks asked her not to use the system until Hicks got approval to do so from Vitol's Geneva office. Cantu nonetheless continued to use the system. (*Id.*, 113–14). Cantu also alleged that Hicks showed a "very strong" attitude towards her, (*id.*, 133); that Hicks would scrutinize her contracts, (*id.*, 135); that Hicks "would throw stuff at my desk," (*id.*); and that Hicks went through her desk, (*id.*).

On February 25, 2009, Reed and Cantu filed their FLSA lawsuit. They faxed a copy of their lawsuit to Vitol on February 26, 2009. (Docket Entry No. 47-2, Ex. A). The parties dispute when Hicks and Colona received notice of the fax. Reed testified that when the fax arrived after 5:00 pm on February 26, 2009, Hicks retrieved it from the fax machine. (Docket Entry No. 47-3, Ex. B., Darlene Reed Depo., 34–35). Vitol argues that Hicks saw the fax transmission when she arrived at work the following morning, February 27, and that she immediately forwarded it to Colona.[3] The timing makes a difference because on February 27, 2009, Vitol terminated Cantu's employment.

As noted, Vitol alleges that Colona had decided to terminate Cantu's employment in late January, at the same time he decided to fire Reed. Colona, describing both Reed and Cantu, stated

---

[3] Vitol alleges that Hicks saw the fax on February 27 and faxed it to Colona, stating, "Looks like we are being sued." (Docket Entry No. 43, at 17). It also alleges that Colona forwarded Hicks's email to Loya, Adams, Vitol's in-house counsel, and Vitol's senior manager, stating "Looks like while I was sending my email about the plan to sever Alma this weekend, [Hicks] was sending this email to me." (*Id.* at 17–18). Vitol has not produced these emails.

that "I spent more time interfacing with [Hicks] on the issues and problems of the performance with these two than all other employees added together in 13 years.  You know, I mean, by the time we had reached into January, it . . . was obvious, there was a problem."  (Docket Entry No. 43-2, Colona Depo. at 48–49).  Colona also stated that he felt their work was "substandard," (*id.*, 5, 9), and failed to "meet the level of output that should be reasonably expected of somebody with that amount of experience and for the amount of pay that they were being offered as a result of that amount of experience," (*id.*, 13).

Cantu responds that Vitol has not identified any specific errors in any contracts she created. Cantu stated that she followed all Vitol procedures for editing and proofreading the contracts, and that no one at Vitol complained to her about her work.  (Docket Entry No. 47-5, Ex. D., Cantu Aff., ¶ 5).  As to Vitol's allegations about the volume of Cantu's work, she points out that Vitol has not produced any evidence as to the contract volume it expected from its administrators and stated that she was never told that she was expected to complete any specific number of contracts.  (*Id.*, ¶ 8).


John Brooks, a trader with whom Cantu worked in creating ethanol trading contracts, testified about Cantu's performance at Vitol.  Brooks could not recall any mistakes made by Cantu brought to his attention.  Nor could he recall any complaints about her work.  (Docket Entry No. 55-2, Ex. K, Brooks Depo. at 14–15).  Brooks acknowledged that he did not supervise Cantu.  (Docket Entry No. 56-2, Ex. 2, Brooks Depo. at 34–35).

Vitol claims that Colona had made the decision to fire Cantu before he had notice of the lawsuit.  (Docket Entry No. 43-2, Depo. at 37, 44).  At 7:27 a.m. on February 27, he sent an email to Loya (Vitol's president), Adams (Vitol's human resources director), Vitol's in-house counsel, and Vitol's senior manager, informing them that he planned "to advise Alma this weekend that her

14

services are no longer required and to not come to the office on Monday and beyond." (Docket Entry No. 43-11, Ex. 28, Feb. 27, 2009 email). In his email, he suggested a severance equivalent to two months' salary. (*Id.*). He also stated that he intended to terminate Reed's employment in "1–2 weeks to minimize the overall disruption back there." (*Id.*). Colona testified that while Reed and Cantu were "not doing enough, they [were] also not doing anything." (Docket Entry No. 43-2, Colona Depo. at 49). He further testified that he determined that the most prudent course was to continue to employ Reed and Cantu so as not to upset Vitol's productivity, while searching for a long-term replacement. (*Id.* at 49–50). Colona stated that he verbally communicated his intention to fire Reed and Cantu to Loya, Vitol's president. (*Id.* at 58–59).

Colona fired Cantu on February 27, 2009 and Reed on March 8, 2009. Reed testified that when Colona called to give her the notice of termination, he told her that "severance is tied to the lawsuit going away." (Docket Entry No. 47-3, Ex. B, Reed Depo. at 75). Reed acknowledged that the only retaliation she alleges is her termination. (Docket Entry No. 43-5, Reed Depo. at 18).

### III.    The Legal Standard

#### A.    Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' — that is, pointing out to the district court-that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325, 106 S. Ct. 2548. While the

party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075. In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

### B.      Retaliation under the FLSA

Section 15(a)(3) of the FLSA makes it unlawful:

> to discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this chapter, or has testified or is about to testify in any such proceeding, or has served or is about to serve on an industry committee

16

29 U.S.C. § 215(a)(3). The *McDonnell Douglas* burden-shifting approach, borrowed from Title VII,

applies. *See Hagan v. Echostar Satellite, LLC*, 529 F.3d 617, 624 (5th Cir. 2008). Each plaintiff

has the initial burden to make out a prima facie case of retaliation. A prima facie case has three

parts: (1) participation in a protected activity; (2) an adverse employment action; and (3) a causal

link between the two. If the plaintiffs make that showing, the burden shifts to Vitol to articulate a

legitimate, nonretaliatory reason for its adverse employment action. If Vitol can provide such a

reason, the burden returns to each plaintiff to show that the proffered reason is a pretext for

retaliation. *Id.* The plaintiffs' summary judgment burden during this third stage is to raise a fact

issue as to whether Vitol took the challenged action "because of" their protected activity. *Id.* (citing

*Kanida v. Gulf Coast Medical Personnel LP*, 363 F.3d 568, 576 (5th Cir. 2004)). This is a "but for"

causation standard. *Benge v. Highgate Holdings*, Civ. A. No. 3:09-CV-1404-B, 2010 WL 2680113,

at *3 (N.D. Tex. July 2, 2010) (citing *Kanida*, 363 F.3d at 580).

Under Title VII, a "causal link" for a *prima facie* case is shown if "the employer's decision

to terminate was based in part on knowledge of the employee's protected activity." *Eberle v.*

*Gonzales*, 240 F. App'x 622, 629 (5th Cir. May 18, 2007) (citing *Medina v. Ramsey Steel Co., Inc.*,

238 F.3d 674, 684 (5th Cir. 2001)). "Close timing between an employee's protected activity and

an adverse action against [her] may provide the 'causal connection' required to make out a prima

facie case of retaliation." *Wilson v. Noble Drilling Servs.*, No. 10-20129, 2010 WL 5298018, at *2

(5th Cir. Dec. 23, 2010) (quoting *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir.

1997)). The Supreme Court has noted that "cases that accept mere temporal proximity . . . as

sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal

proximity must be 'very close.'" *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

The Fifth Circuit has found temporal proximity of up to four months sufficient to show a causal link.

*See, e.g.*, *Stroud v. BMC Software, Inc.*, No. 07-20779, 2008 WL 2325639 (5th Cir. Jun. 6, 2008) (finding that a three-week lapse between protected activity and adverse employment action was sufficient to show a causal link); *Richard v. Cingular Wireless LLC*, 233 F. App'x 334, 338 (5th Cir. Apr. 13, 2007) (concluding that two-and-one-half months is short enough to support an inference of a causal link); *Jones v. Robinson Property Group, L.P.*, 427 F.3d 987, 995 (5th Cir. 2005) (finding that a period of less than sixty days was sufficiently close to establish a causal link for a *prima facie* case of retaliation); *Ware v. CLECO Power LLC*, 90 F. App'x 705, 708 (5th Cir. Jan. 21, 2004) (unpublished) (finding a fifteen-day period sufficient to support an inference of causation); *Evans v. City of Houston*, 246 F.3d 344, 355 (5th Cir. 2001) (finding that "a time lapse of up to four months has been found sufficient to satisfy the causal connection for summary judgment purposes" (internal citations omitted)).

## III.   Analysis

### A.   The Issue of Timing

Reed and Cantu allege that they engaged in protected activity when they filed their lawsuit; that their termination was an adverse employment action; and that the proximity in time establishes the causal link. The parties agree that filing an FLSA lawsuit is a protected activity and that firing is an adverse employment action. The parties dispute whether Hicks or Colona knew of the suit before the decision was made to fire Reed or Cantu. It is undisputed that Hicks and Colona knew of the suit shortly before Colona told both Reed and Cantu that their employment was terminated. Reed and Cantu faxed their FLSA complaint to Vitol on February 26, 2009. An email shows that less than twenty-four hours after the fax, Colona told others at Vitol that he would fire Cantu that weekend. He fired Reed two weeks after the fax. The dispute is primarily over whether Colona had

already decided to fire them in January or early February 2009, before they faxed a copy of their lawsuit to Vitol's office on February 26, 2009.

The law is clear that a discharge cannot be in retaliation for protected activity if the decision to discharge is made before the protected activity occurs. *O'Neal v. Roadway Express*, 181 F. App'x. 417, 421 (5th Cir. May 11, 2006); *see also Jimenez v. Potter*, 211 F. App'x 289, 290–91 (5th Cir. Dec. 22, 2006) (holding that an employee was not retaliated against for filing a complaint with the Postal Service Equipment Office because he was demoted before he filed the complaint); *Nicastro v. N.Y.C. Dep't of Design and Const.*, 125 F. App'x 357 (2d Cir. Mar. 14, 2005) (upholding summary judgment in favor of employer because most of the alleged adverse decisions occurred before the plaintiff engaged in protective activity and the rest were too remote in time from the protected activity); *Platt v. The Incorp. Village of Southampton*, No. 08-CV-2953, 2009 WL 3076099, at * (E.D.N.Y. Sept. 21, 2009) ("Even if plaintiff engaged in protected activity, he can only rely on alleged discriminatory or retaliatory treatment that occurred after he engaged in protective activity to establish his retaliation claims."); *Reilly v. Capgemini Am., Inc.*, Civ. A. No. 3:05-CV-1162-K, 2007 WL 945685, at *8 (N.D. Tex. Mar. 28, 2007) ("Because defendants were unaware that Reilly intended to pursue a discrimination claim at the time of the decision to discharge him, Reilly cannot establish that the reasons set forth by Defendants for his selection in the reduction in force are pretextual."); *Stephan v. Greater New Orleans Fed. Credit Union*, Civ. A. No. 09-3712, 2009 WL 2827642, at *3 (E.D. La. Nov. 16, 2009) ("Stephan could not have been terminated 'because' of a report that she had not yet made at the time of her firing.").

### 1.    Reed

The summary judgment evidence clearly shows that Colona was planning to fire Reed as early as January 5, 2009. He delayed doing so to find a replacement. He hired a replacement on

February 25 who would begin work on March 2.  The undisputed evidence shows that Colona had decided to fire Reed before Reed filed this lawsuit.  There is no retaliation, as a matter of law.

The evidence includes numerous emails documenting deficiencies in Reed's performance and the difficulties Hicks and others had with her work.  The emails specifically relating to plans to fire her include the following:

- a November 10, 2008 email in which Colona stated that Reed's chances of retaining employment were 50/50, (Docket Etnry No. 43-6, Ex. 9, November 10, 2008 email chain);

- a January 5, 2009 email in which Colona stated Reed should be fired and that he and Hicks should plan for a replacement, (*id.*, Ex. 15, January 5, 2009 email chain);

- a January 14, 2009 email in which Colona again stated that Reed should be fired, (*id.*, Ex. 16, January 15, 2009 email chain);

- a January 21, 2009 in which Colona told Hicks to discuss Reed's performance issues, but also stated that Hicks was fired "as far as [he was] concerned" and that they should continue looking for a replacement, (*id.*, Ex. 17, January 21, 2009 email chain);

- a February 6, 2009 email to Hicks from a personnel consultant describing three job candidates,  (*id.*, Ex. 19, MK Personnel email); and

- a February 20, 2009 email extending a job offer for an administrator position and a February 25, 2009 email accepting the employment offer, (*id.*, Ex. 21, Feb. 20, 2009 email; Ex. 22, Feb. 25, 2009 email chain).

Reed argues that a fact issue nonetheless exists as to when Colona actually finalized his decision to terminate her.  She points to a February 4, 2009 memo prepared by Hicks on February 4, 2009, which lists eight problems with Reed's work, and admonishes her that "[f]ailure to comply with these requirements or any further performance/behavior problems may result in additional

action, potentially including dismissal."  (Docket Entry No. 47-8, Ex. G, Reed memo.).  Reed acknowledges that neither Hicks nor Colona sent her this memo.  The evidence shows that such a memo was a standard evaluation document that was prepared as a matter of routine practice but retained in the file instead of being sent to Reed because of the plan to fire her.  Nothing in the memo controverts Vitol's claim that Colona had already decided to fire Reed when she filed her FLSA lawsuit.

The summary judgment record also fails to show evidence of pretext.  There is ample evidence that both Hicks and Colona believed that Reed's work was inadequate and deficient.  *See Swanson*, 110 F.3d at 1186 ("The pretext question is not a question whether [the plaintiff] 'considered himself' late, but whether [his employer] considered [the plaintiff] late when he decided to charge [the plaintiff] with annual leave for his tardiness."); *Jones v. Sears, Roebuck and Co.*, Civ. A. No. 3:08-cv-190-HTW-LRA, 2010 WL 2955726, at *6 (S.D. Miss. July 23, 2010) ("[T]he issue is whether the employer's perception of her work performance and violation of workplace rules, accurate or not, was the real reason for her termination." (citing *Evans*, 246 F.3d at 355)).  Vitol has produced substantial evidence, including

•      an October 24, 2008 email from Hicks advising Colona that Reed was having difficulty working with Mandel, a Vitol trader, (Docket Entry No. 43-6, Ex. 7, Oct. 24, 2008 email chain; Ex.  8, November 7, 2008 email chain);

•      two November 12, 2008 emails from Hicks to Reed and forwarded to Colona listing issues with Reed's contracts and expressing frustration with Reed's ability to accept criticism, (*id.*, Ex.  9, November 10, 2008 email chain; Ex. 10, November 12, 2008 email chain);

•      a November 20, 2008 email from Hicks to Colona expressing concern about Reed's "abilities and judgment," and whether Reed "get[s] this," (*id.*,  Ex. 11, November 20, 2008 email);

- a meeting between Colona and Reed in which Colona told her "that her attitude needed to change toward the traders and particularly toward [Hicks]." (Docket Entry No. 43-6, Ex. 14, November 26, 2008 email chain); and

- a January 21, 2009 email from Hicks stating that Reed had been over two weeks behind on her work and was "just . . . not doing her job," (*id.*, Ex. 17, January 21, 2009 email chain).[4]

Other testimony is consistent. Maaroui testified that he was frustrated with the questions that Reed asked, and that he told Hicks about his concerns with Reed. Reed's assessment of her own work and Maaroui's testimony do not create a fact issue as to pretext.[5]

Vitol's motion for summary judgment is granted as to Reed's retaliation claim.

### 2.    *Cantu*

The evidence relating to Cantu is different than the evidence relating to Reed. Although Vitol asserts that Colona had decided to fire Cantu at the same time as Reed, there are no documents showing such a plan. There are far fewer emails documenting performance concerns related to Cantu and no emails discussing a decision to fire her before February 26, 2009. Cantu also points to testimony from a Vitol trader, John Brooks, to rebut Colona's stated reasons for terminating her. Cantu asserts that without documents showing a prior plan to fire her, the evidence of a causal link between her FLSA suit and her firing is particularly strong because the decision to fire her was made the day after her suit was filed and the same day Vitol learned of it.

---

[4]  Reed also argues that to the extent Vitol argues that Colona terminated Reed because of her inability to get along with supervisors, it is inconsistent with Colona's testimony and supports an inference of pretext. Vitol does not argue that Reed was terminated because of her ability to get along with supervisors. If it did, however, this would be consistent with Colona's stated reasons for terminating her because it adds detail and additional reasons. *See Nasti v. CIBA Specialty Chems. Corp.*, 492 F.3d 589, 594 (5th Cir. 2007) (holding that an employer may add consistent reasons to a decision to fire an employee without giving rise to an inference of pretext).

In response, Vitol relies on after-the-fact testimony from Hicks and Colona about Cantu's work to support its reasons for Cantu's termination.  Vitol also notes that Brooks was not Cantu's supervisor.  As to the timing, Vitol argues that evidence shows that Colona learned of the lawsuit on the same day he decided to fire her, but late that day.

Courts have held that undocumented, after-the-fact explanations may support an inference of pretext.  *See Lloyd v. Georgia Gulf Corp.*, 961 F.2d 1190, 1195 (5th Cir. 1992) ("[W]hen an employer's stated motivation for an adverse employment decision involves the employee's performance, but there is no supporting documentation, a jury can reasonably infer pretext."); *Walther v. Lone Star Gas Co.*, 952 F.2d 119, 124 (5th Cir. 1992) (finding that based on a defendant's inability to point to evidence in a personnel file indicating performance dissatisfaction, a jury could reasonably infer that the defendant's explanation was 'an after-the-fact inspiration triggered by the necessity of fending off litigation.'" (quoting *Graefenhain v. Pabst Brewing Co.*, 827 F.2d 13, 21 (7th Cir. 1987)).  While a lack of documentation is insufficient, standing alone, to establish pretext, *see  Mire v. Tex. Plumbing Supply Co.*, 286 F. App'x 138, 143–44 (5th Cir. July 10, 2008), it does provide evidence of pretext.        Brooks testified that he could not recall any mistakes made by Cantu brought to his attention, nor could he recall any complaints about her work. (Docket Entry No. 55-2, Ex. K, Brooks Depo., 14–15).  Vitol points out that Brooks was not Cantu's supervisor.  But Brooks's  testimony rebuts Colona's testimony that traders had complained to him about her work.  It differs from Maaroui's testimony about Reed, which ultimately confirmed Colona's testimony, and creates a fact issue as to Vitol's reasons for Cantu's termination.

The proximity in time between Cantu's termination, and her fax of her lawsuit to Vitol, provides additional evidence of pretext.  The parties agree that Cantu and Reed faxed notice of their lawsuit to Vitol on February 26 some time after 5:00 p.m.  Hicks testified that she did not see the

fax until she arrived to work on February 27, and that she promptly informed Colona. Colona testified that he received notice from Hicks after he sent an email to Vitol executives informing them of his intention to terminate Cantu. Cantu, however, has submitted conflicting evidence. In her affidavit, Reed stated that she saw Hicks retrieve faxes sent to Vitol around the time that a copy of Cantu's lawsuit was sent. Cantu argues that the working relationship between Hicks and Colona supports an inference that Hicks informed Colona about the lawsuit immediately, before he decided to fire Cantu. (Docket Entry No. 47-3, Ex. B., Reed Depo. at 34–35). This is a fact dispute best left to a jury.

Vitol's motion for summary judgment is denied as to Cantu's retaliation claim.

**IV.     Conclusion**

Vitol's motion for partial summary judgment is granted as to Reed's retaliation claim and denied as to Cantu's retaliation claim.

SIGNED on February 7, 2011, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

24